Fabricant, J.
INTRODUCTION
This action presents a dispute as to the defendant insurance company’s handling of the plaintiffs tort claim against its insured arising from a motor vehicle accident. The plaintiff contends that the insurer violated G.L.c. 176D, §3(9)(f) and G.L.c. 93Aby “failing to effectuate [a] prompt, fair and equitable settlement” of the tort claim. Based on the evidence presented at trial and arguments of counsel, the Court makes the following findings of fact, conclusions of law, and order for judgment.
I.Findings of Fact
1. On January 22, 1993, at approximately 1:00 a.m., the plaintiff Robert Almy was driving North on Route 1 in Peabody, when he was struck in the rear by Ronald LaPorte, who was driving a vehicle owned by John Sullivan, an insured of Commercial Union. LaPorte was intoxicated and was driving very fast. Almy’s car rolled over several times, but came to rest upright. Almy was restrained by his seat belt and shoulder harness, which spared him the devastating injuries that might otherwise have resulted. Almy suffered injuries to his shoulder and knee, requiring medical treatment and disabling him from work for a period of time, along with emotional injuries requiring psychiatric treatment and affecting his ability to drive at night for a period of time.
2. Commercial Union, according to its records, received notice of the incident on January 27, 1993. On that date, its adjuster, Stuart McKay, attempted unsuccessfully to contact Almy. McKay prepared an “Adjuster’s First Report" form, on which he noted his evaluation of liability as 100%.
3. McKay’s next written report, dated February 25, 1993, indicates that by that date McKay had had some communication with Attorney Michael Fuller on behalf of Almy. Attorney Fuller had informed McKay that Almy had fractured his right shoulder, that Fuller was not yet in a position to provide further information regarding the injuries, and that Almy would be unable to return to work until March 25, 1993.
4. Commercial Union’s company policy requires adjusters to make an evaluation of each claim within thirty days of the company’s receiving notice, from whatever information is available at that time, in order for the company to post a reserve for the claim. A reserve is an amount identified as the approximate settlement value of the claim, a percentage of which the company is required by state regulation to set aside in an escrow account pending resolution of the claim.
5. In accord with this requirement, McKay calculated a figure of $13,100 for Almy’s lost income, added to that a figure of $3,900 (the meaning of this figure was not established in testimony at trial), and arrived at a total of $17,000, which he indicated on his February 25, 1993 report as his recommended reserve. McKay also noted on the report his evaluation of liability as “100%.”
6. As of April 27, 1993, when McKay’s supervisor signed a “90 Day/6 Months Supervisory Review Form” on the case, the company had given the case a damage reserve of $17,000 and an expense reserve of $1,000. McKay’s supervisor noted on the form that no “support” had yet been received from Almy’s attorney, and that the adjuster would follow up.
7. On May 21, 1993, Commercial Union received a subrogation claim from Almy’s insurer for the amount it had paid Almy for the value of his car and for towing fees. Commercial Union paid that claim on May 26, 1993, with McKay noting to his file that “we have accepted 100% liability.”
8. On July 29, 1993, McKay received a package of documentation from Attorney Fuller, showing expenses incurred of $7,929.91 for medical treatment and $688.95 for rental fees. McKay noted to his file that he contacted Fuller, that the attorney “has not kept up with case,” and “was unsure what medical treatments his client has incurred,” and that the attorney “will review and get back to me." McKay also noted that the company paid Almy for the rental charges, and that the “reserve will be increased next month.”
9. On October 8, 1993, McKay received additional documentation, bringing the medical expenses up to a total of $8,898.91, and providing further details of the injuries and lost wages. McKay made calculations, shown in his file note, reaching a total of $36,600. He noted that he made an unsuccessful attempt to contact Almy’s attorney, and that “upon reviewing will increase reserve.”
10. On November 1, 1993, McKay received additional invoices for medical treatment of Almy, bringing the total medical expenses to $9,443.66. He spoke *421 with Attorney Fuller, and “was informed that claimant has stopped treating and a demand will be forthcoming once final reports are received.” McKay noted to his file that he had “reevaluated loss with supervisor," and made calculations totaling $25,500. He further noted “range 23,000 — 25,000,” and “FV 25,000.” “FV” stands for “full value,” a term used in the insurance industry to refer to the company’s estimate of the settlement value of the claim, after consideration of all available information.
11. On November 9, 1993, McKay’s supervisor prepared a “90 Day/6 Month Supervisory Review Form,” indicating that as of that date the company’s damage reserve for the case was $25,000, its expense reserve was $2,500, its Full Value figure was $30,000, its “exposure factor” was 100%, and its settlement strategy was “continue toward settlement.”
12. In further correspondence between November of 1993 and April of 1994, McKay requested and Fuller provided further documentation of Almy’s injuries and expenses.
13. By letter to McKay dated April 18, 1994, Attorney Fuller forwarded a final medical report, and made a demand on behalf of Almy of $150,000 “for full and final settlement." This was Almy’s first demand in a specific dollar amount. McKay responded with a letter dated April 27, 1994, acknowledging the demand and requesting further documentation of lost wages.
14. The next communication between the parties was a letter from Attorney Fuller to McKay, dated July 22, 1994, enclosing the requested documentation, along with photographs of the damage to Almy’s car, and setting forth arguments in support of the $150,000 demand. The factors asserted as supporting the reasonableness of the demand included “today’s climate against drunk drivers” and “your insured operator’s continued default on his criminal charges.”
15. On July 28, 1994, McKay noted to his file that he had “received demand package from attorney.” He made a series of calculations, reaching a total of $31,300. He noted “range 25,000 — 30,000,” and that he would review with his supervisor before making an offer.
16. On August 2, 1994, McKay’s supervisor prepared a “90 Day/6 Month Supervisory Review Form." The supervisor noted that the present damage reserve was $25,000, that the “new res.” would be $40,000, that the Full Value of the case was $40,000, and that the exposure factor was 100%. The supervisor also noted that Almy’s attorney “has now made a demand of $150,000,” that the company would “have adjuster extend an offer. If no significant movement from atly. Then will refer for ortho. Medical record review,” and that the company’s settlement strategy at that time was “case to try and settle but demand is excessive.” The supervisor attached a note to McKay, suggesting “an initial offer of $25,000,” with an orthopedic medical record review to be conducted “if atly is still up around $100,000.”
17. By letter dated August 4, 1994, addressed to attorney Michael Fuller and signed by McKay, Commercial Union offered Almy $25,000 in settlement of his claim. Almy, according to his testimony at the trial of this action, “was insulted” by the amount of the offer, and was unsure whether it would cover his out-of-pocket expenses, including in that figure the price of a new car he had to purchase as a result of the accident.
18. In September, 1994, Attorney Fuller filed suit in Essex Superior Court on behalf of Almy. The two named defendants, LaPorte and Sullivan, were served on September 24, 1994. Commercial Union engaged Attorney Michael P. Mamik, of Peabody, to defend its insureds. Marnik has extensive experience in the litigation, settlement, and trial of personal injury cases. As of the time of his testimony at trial of this case he had practiced for 27 years, specializing in personal injury cases. He had represented both plaintiffs and defendants in such cases, had tried some 60 cases to jury verdict in Essex County, about seventy-five percent of which involved motor vehicle collisions, and had settled about 1,200 cases.
19. The next written communication between the parties to this case was a demand letter under c. 93A, from Attorney Fuller to McKay, dated October 11, 1994. Fuller characterized Commercial Union’s offer as “ridiculously low,” “low-ball,” and “woefully low," and made reference to a conversation on August 12, 1994, in which he had advised the company that “my client was not considering the $25,000 and that your company would have to be in the $100,000 to $110,000 range in order for my client to consider your company’s offer.” The letter asserted that the company’s handling of the claim was in violation of G.L.c. 176D, §3, and a failure to respond “offering a reasonable settlement” would compel the commencement of suit under G.L.c. 93A.
20. C.J. Connon, Commercial Union’s Litigation Supervisor, responded with a letter dated November 12, 1994. Connon’s letter, while not conceding liability, stated that “the liability issue will not be an obstacle which will prevent a fair settlement of this case,” and that he had sent the rental reimbursement under separate cover.[1] Connon summarized the materials provided to support the damages claim, and noted that “the interpretation of the [MRI] study noted degenerative involvement as opposed to a tear.” He requested a copy of the MRI study, and also inquired whether Almy would voluntarily submit to examination by an impartial physician. Connon noted that Almy’s employer had compensated him for all lost work time, and that his insurer had paid $5,000 of his medical expenses. Connon concluded that the $25,000 already offered was “fair and reasonable at this time” based on “the material you have provided to *422 us as of this writing,” but invited Attorney Fuller to forward “anything further which you believe we should consider,” and noted that “we also express our willingness to submit this claim to mediation following the impartial medical examination of your client.”
21. On January 17, 1995, Connon prepared a “90 Day/6 Months Supervisory Review Form" on the case. He listed the Full Value of the case as “$37-45,000,” damage reserve as $40,000, expense reserve as $2,500, and exposure factor as 100%. He noted “We are in the early stages of discovery. Demand is $100K. Offer is $25K. 93A letter responded to.”
22. In March of 1995, Fuller and Connon exchanged correspondence regarding the relevance of a Superior Court decision in another case involving a c. 93A claim against an insurer. Connon’s letter to Fuller, dated March 16,1995, stated that “[t]here is no change in our offer of settlement” but that “we would be agreeable to attend a mediation of this case.”
23. On April 13, 1995, Attorney Marnik reported to Connon regarding the progress of discovery in the case. After describing LaPorte’s deposition and noting his conviction and incarceration for driving under the influence, he stated that “at the appropriate time we will waive any liability defenses.” Marnik reported on a conversation with Fuller regarding Almy’s injuries, observing that counsel “seemed somewhat unfamiliar with the injuries but volunteered that plaintiff still is experiencing symptoms of pain in one knee, although he was back to work.” Marnik reported that counsel had agreed to an independent medical examination.
24. On July 3, 1995, Connon prepared another “90 Day/6 Month Supervisory Review Form.” His figures for damage reserve and full value did not change from the last such form, but his figure for expense reserve increased to $7,500. He noted “no change in negotiations since my last review on 1/17/95. We are waiting for the results of an I.M.E. to reevaluate.”
25. By letter dated July 6, 1995, Dr. James M. Gibbons reported to Attorney Marnik the results of his orthopedic examination of Almy. Dr. Gibbons’s opinion, as expressed in that letter, was that Almy was totally disabled from January 22, 1993 until February 22, 1993, and partially disabled until March 7, 1983, and that he had no permanent disability or loss of function. Dr. Gibbons noted that Almy still complained of knee pain, but stated that “I cannot causally relate his current complaints to the accident.” Attorney Marnik forwarded Dr. Gibbons’s report to Connon, with a cover letter describing it as “the first break for the defense in this case.” Marnik stated that “[wje are now in a position to concede liability and to defend on the issue of whether any permanent knee injury was caused by the accident.”
26. On October 11, 1995, Attorney Marnik served an offer of judgment in the amount of $25,000.
27. On October 25, 1995, the case was called for pretrial conference before Judge Roseman. At this point, Marnik had enough information to form his own opinion of the value of the case, which was about $45,000. As is usual in such cases, he had not been told the amount Commercial Union had established as the reserve for the case or its “Full Value.” Up to this point, as Attorney Marnik testified, Attorney Fuller had “never hinted that the case could settle under six figures.”
28. At the pretrial, as later reported by Marnik to Connon, in response to inquiry from Judge Roseman Attorney Fuller “said his demand was originally $125,000, but that the plaintiff had ‘hardened’, so that the new demand was $250,000.” Marnik’s written account goes on to state that “[t]he Judge was dismayed at these numbers, especially since there was no stability to them. He said that the case ought to be tried. Then, plaintiffs counsel said that he valued the case at between $75,000 to $90,000.1 told the Judge that I was certainly willing to negotiate, but $75,000 was still well off the mark.”
29. On November 30, 1995, Almy and Attorneys Fuller and Marnik attended a conciliation, at which parties and counsel met with the conciliator at times jointly and at times separately. The conciliator evaluated the case at $47,500. Almy demanded $75,000.[2] Marnik telephoned Connon, who authorized him to settle the case for up to $45,000. Marnik then told the conciliator, in a private session, that “I can get close to your figure but I have to see whether the demand is going to change or not.” Marnik asked the conciliator to “do what you can.” Marnik did not make any offer to Fuller other than the $25,000 previously offered, and did not inform Fuller that he had obtained authority up to $45,000. Marnik did not receive from Fuller, “directly or indirectly,” as he testified at trial, any demand lower than $75,000. The conciliation ended without success. I infer that the conciliator, in private conversation with Fuller and/or Almy, gave some degree of indication that the defendant could be persuaded to offer settlement in the range of the figure the conciliator had identified as the case’s value, and sought but did not receive an indication that Almy would settle in that range.
30. On December 15, 1995, Connon prepared another “90 Day/6 Month Supervisory Review Form. ” His figures for damage reserve and full value did not change from the last such form, but his figure for expense reserve increased to $15,000. He noted “no movement from plaintiff off $75,000,” and attached notations summarizing the conciliation.
31. The case was called for trial on April 3, 1996, before Judge Grabau. Marnik indicated his intention to stipulate to liability, and presented a motion in limine to exclude evidence of LaPorte’s intoxication as irrelevant in light of that stipulation. Marnik’s perception was that Judge Grabau was leaning toward grant- *423 tag that motion. In a lobby conference with Judge Grabau, as recounted by Attorney Marnik, Attorney Fuller indicated that Almy wanted to recover $ 100,000 net. Marnik indicated that that figure was higher than the previous demand, and was not acceptable. Judge Grabau, according to Attorney Marnik’s account, evaluated the case at $45,000. At this point Attorney Fuller conferred with Almy privately, and then came back with a demand of $57,500. Marnik responded with an offer of $40,000, and the case then settled for $45,000.
32. At the trial of this case, Almy presented as his expert Kenneth Pierce, who is retired after having worked for Aetna Casualty & Life Insurance Company for 32 years, in a series of increasingly responsible positions supervising the handling of liability claims. Pierce opined that the case was worth between $40,000 and $50,000, that Commercial Union’s $25,000 offer was “openers,” that Almy’s demand of $150,000 was “stratospheric,” and that his demand of $75,000 offered opportunities for settlement. In Pierce’s opinion, in the course of negotiation “you don’t give up your top amount on your first offer”; rather, the “waters have to be tested.” Pierce further opined that it would not be prudent to offer “what you want to settle for” if the demand is much higher, and that it is generally understood among attorneys that an initial offer is not final. It was Pierce’s opinion, however, that Almy’s $75,000 figure, expressed at the pre-trial conference and again at the conciliation, provided opportunities for Commercial Union to raise its offer from $25,000 to a level within the range of its full value.
33. From the time it first had full information regarding Almy’s damages, in approximately the summer of 1994, Commercial Union assigned the case a value at the level it eventually settled for, and at the level assigned to it by virtually everyone else who reviewed the case — Attorney Marnik, the conciliator, Judge Grabau, and Mr. Pierce. I find, therefore, that Commercial Union evaluated the case accurately, and that the value of the case was $45,000.
34. Commercial Union’s evaluation reflected its initial doubts, later confirmed by Dr. Gibbons, as to the causation of the plaintiffs continuing knee problems, on the basis of which he sought compensation for a claimed permanent partial disability.
35. Commercial Union’s negotiating objective was to achieve settlement at the value of the case. Its strategy to achieve that objective was to refrain from offering the case’s value until such time as it had reason to believe that such an offer would be accepted, rather than becoming the basis for negotiation upward from that level. It wanted to avoid putting itself in a situation in which it would be subject to pressure to raise its offer to a level higher than the value of the case.
36. The plaintiffs initial demand was more than three times the value of the case. Commercial Union responded with an offer of about sixty percent of the value of the case. Commercial Union did not expect Almy to accept that offer, but expected its offer to stimulate negotiation, which would include a series of offers and counter-offers that would eventually conclude in settlement within the range of the value of the case. Because its offer failed to stimulate the expected movement from the plaintiff, Commercial Union itself refrained from movement. Later, as litigation proceeded toward trial, Almy’s position fluctuated, but prior to the trial date never came lower than an amount more than 150% of the value of the case. Commercial Union, not having received the signal it sought that an offer of the case’s value would be accepted, refrained from making such an offer, and also refrained from any increase in its initial offer. It did, however, signal its willingness to negotiate above that offer on several occasions, including in its suggestions of mediation, in Marnik’s statements at the pre-trial conference, and in communication through the conciliator.
37. The first indication that Almy would settle at the case’s value came on the date of trial, in the form of the $57,500 demand, made after there appeared to be a likelihood that the juiy would evaluate Almy’s damages without knowledge of LaPorte’s intoxication. This broke the logjam, leading Marnik to make an offer within the range of value, and thus producing settlement.
38. Almy testified at the trial of this case regarding the accident, his injuries, his reaction to the $25,000 offer, and the experience of making repeated trips to court. He was not asked, and did not say, whether he would have accepted an offer of $45,000 at any time prior to the date the case settled. I infer that he would not have done so at any time prior to that date.
II. Conclusions of Law and Discussion
General Laws c. 176D, §3(9)(f) makes it an unfair and deceptive practice for an insurance company to “fail[ ] to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.” Under G.L.c. 93A, a person injured by such a practice may claim relief, including, if the use of the practice was willful or knowing, up to three times the amount of actual damages. These provisions, in combination, serve to compel insurers to settle well-founded claims promptly and fairly, rather than to “wear out the claimant by unduly delaying settlement when liability is clear.” Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc., 36 Mass.App.Ct. 411, 418 (1994).
Almy argues that c. 176D required Commercial Union to pay him the value of the case and to do so promptly, and that promptly in this case would have been not later than 30 days after Fuller’s 93A letter in October of 1994. Almy contends that this statutory *424 duty was entirely independent of his own conduct with respect to settlement. Thus, Almy argues, Commercial Union’s failure to offer the value of the case until the trial date, some 18 months after his 93A letter, was a willful breach of its statutory duty, for which he is entitled to recover multiple damages. In support of this argument, Almy points out that c. 176D applies to insurers, not to plaintiffs. From this he reasons that the duty to negotiate reasonably is one-sided; the insurer must be reasonable, whether the plaintiff is or not. Commercial Union counters that the concept of reasonableness is inherently two-sided, in that its reasonableness can be evaluated only in reference to the factual context, which includes the facts of the other side’s negotiating posture. Here, it argues, its $25,000 offer, and its failure to increase that offer, were reasonable in the context of Almy’s “stratospheric” first demand, the level of his later demands, and his negative responses to its signals of willingness to negotiate above its initial offer.
The parties have cited no Massachusetts decision addressing this question.[3] Commercial Union, however, cites a First Circuit case, involving facts substantially similar to these, in which the court construed c. 176D in exactly the manner Commercial Union urges here. Forcucci v. United States Fidelity & Guaranty Co., 11 F.3d 1 (1st. Cir. 1993). As Judge Aldrich observed there, “[t]he reasonableness of a defendant’s response is to be considered in the light of the situation as a whole, one aspect of which was the size of plaintiffs demand.” Id. at 2.[4]
Although the First Circuit’s reading of Massachusetts law does not bind this Court, I conclude, as it did, that c. 176D permits an insurer to consider a claimant’s negotiating posture in formulating its owp. The legislature is certainly well informed of insurance practices, and could have, if it chose, explicitly required insurers to pay the amount they identify as Fair Value, and to do so at some prescribed point in time, such as within a specified number of days after receiving documentation of the claim. The legislature did not chose that route. Rather, it defined the insurers’ duty as “prompt, fair, and equitable settlement.” Each of these four terms- — prompt, fair, equitable, and settlement — in itself indicates a standard that can be identified only by reference to the conduct of the other side in a two-sided negotiation. The four terms together are still more indicative of mutuality. The language chosen by the legislature reflects its full awareness of the norms of negotiation. It did not prohibit insurers from negotiating, or from doing so in accord with those norms, which include each party considering the other party’s stance at each stage to determine the amount of distance it needs to retain from its target to insure that the ultimate result will be at, rather than above, the target. Cf. Parker v. D’Avolio, 40 Mass. App. 394, 402, n.9 (1996) (courts must “be vigilant to ensure that plaintiffs not engage in ‘reverse bad faith’ ”).
Here, the plaintiffs bargaining posture was unreasonable at every stage until the last. There are suggestions that he hoped for an award more reflective of LaPorte’s culpability than of his own injuries — in effect, punitive damages rather than compensatory— and that his settlement posture became reasonable only after that hope was dispelled. In this context, Commercial Union made the judgment that an offer of value before that time would not effectuate a fair settlement, but would subject it to pressure to settle above value. That judgment, in the context of the course of this negotiation, was not unreasonable, and appears to have been correct. Accordingly, I conclude that Commercial union’s conduct in this case effected a fair and equitable settlement as promptly as the plaintiffs conduct would allow, and did not violate c. 176D.
III. Order
For the reasons stated, it is hereby ORDERED that judgment enter for the defendant, Commercial Union Insurance Company.

 yhe evidence does not explain the apparent discrepancy between this statement and McKay’s file note of July 29, 1993, indicating that the rental charge was paid at that time.

 The evidence presented at trial did not indicate how this demand was communicated in the course of the conciliation.

 fyhe Supreme Judicial Court’s decision in Bonofiglio v. Commercial Union, 411 Mass. 31, 34 (1991), notes the arguments on this point, but does not address them, concluding that the issue was not properly preserved in the trial court in that case.

 Brandley v. United States Fidelity & Guaranty Co., 819 F.Supp. 101 (D.C. Ma. 1993), decided by the same judge whose decision the First Circuit affirmed in Forcucci does not stand for the contrary proposition. The Court there based its finding of violation not solely on a low offer, but on that offer as a "link in [a] chain of unresponsive behavior.” Id. at 105. No such chain exists here.